# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 4, 2016

## STATE OF TENNESSEE v. HAROLD ALLEN VAUGHN

**Appeal from the Circuit Court for Madison County**
**No. 15-231   Donald H. Allen, Judge**

_____

**No. W2016-00131-CCA-R3-CD – Filed December 6, 2016**

_____

The Defendant, Harold Allen Vaughn, and his co-defendants, were indicted by a Madison County Grand Jury for attempted first degree murder, aggravated assault, especially aggravated kidnapping, and especially aggravated robbery. Following a jury trial, the Defendant was convicted of attempted first degree murder resulting in serious bodily injury, aggravated assault, and especially aggravated robbery. The trial court merged the aggravated assault conviction into the attempted first degree murder conviction and sentenced the Defendant to an effective sentence of twenty-five years to be served in the Tennessee Department of Correction. On appeal, he argues that the evidence is insufficient to sustain his convictions and that the trial court erred in failing to instruct the jury that his co-defendant was an accomplice as a matter of law. Upon review, we affirm the judgment of the trial court but remand for entry of a judgment form as to count two reflecting that the Defendant's aggravated assault conviction was merged with count one.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgments**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and TIMOTHY L. EASTER, JJ., joined.

Gregory D. Gookin, Assistant District Public Defender, Jackson, Tennessee, for the Defendant-Appellant, Harold Allen Vaughn.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; James G. Woodall, District Attorney General; and Brian M. Gilliam, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

This case concerns the robbery and shooting of the victim, Christopher Tompkins. The Defendant, and his co-defendants, James N. Martin and Bethany Lashun Long, were subsequently arrested and charged with attempted first degree murder, aggravated assault, especially aggravated kidnapping and especially aggravated robbery. The Defendant filed a motion to sever his case from his co-defendants' cases, and the trial court granted the motion.[1] Following a trial, the court dismissed the kidnapping charge, and the Defendant was otherwise convicted as charged.

Christopher Tompkins testified that, on November 24, 2014, he traveled by bus to Jackson, Tennessee from Memphis, Tennessee to pick up a vehicle for his employer. After learning that the vehicle was disabled, Tompkins walked to a nearby Love's Truck Stop to call his friend for a ride back to Memphis. While waiting on his ride, he met Bethany Long, an employee at the Hardee's restaurant at the Love's Truck Stop. He also met Long's boyfriend, the Defendant, and the Defendant's friend, James Martin. As Tompkins was leaving the truck stop, the Defendant offered to give him a ride if his friend did not show up, and they exchanged phone numbers. Shortly after the Defendant left, Tompkins called him and offered to pay $100 if the Defendant would drive him to Memphis, and the Defendant agreed. The Defendant then returned to the gas station, along with Martin, to pick up Tompkins. Tompkins testified that the Defendant and Martin arrived in a silver car with an unknown female driver. Shortly after leaving the gas station, the female driver said she had a family emergency, and she drove Tompkins, the Defendant, and Martin to the Defendant's car at the Lincoln Courts apartment complex. After getting in the Defendant's car, Tompkins, the Defendant, and Martin drove to another gas station where Tompkins purchased gas for the car and two beers. The Defendant then drove to pick up his girlfriend, Long, so she could drive the Defendant's car to Memphis.

Tompkins testified that shortly after Long began driving to Memphis she pulled off the interstate because she was sick. The Defendant then got in the driver's seat and began driving away from the interstate and into a rural area. Tompkins tracked their route by GPS on his phone and told the Defendant he was going the wrong way, which the Defendant denied.

After driving further away from the interstate, the Defendant suddenly stopped the vehicle on an unlit road and asked Tompkins to help him with his headlights, which he

---

[1] The record provided on appeal does not include the trial court's order granting the motion to sever, nevertheless, we assume based on subsequent orders and proceedings in the record that the Defendant's case was severed from his co-defendants' cases.

claimed were not working correctly. Tompkins declined and instead suggested that Martin help the Defendant with his headlights. Martin exited the car to assist the Defendant with his headlights. Tompkins remained in the car and texted his friend the name of the road he was on and told her to call the police because "something is up with this guy." The Defendant then appeared at the passenger side of the car and pointed a gun in Tompkins's face.

The Defendant held Tompkins at gunpoint and directed Martin to search him. The Defendant and Martin searched Tompkins while he was still seated in the car and then pulled him out of the car and continued to search him, taking Tompkins's wallet, phone, tablet, and two bags of personal belongings and clothes, which were in the back seat of the car. Tompkins testified that the Defendant then pushed the gun to his temple and told him to get on the ground. As Tompkins began to comply, he testified that he "looked up to the right where the gun [was], and as [he] did that, [the Defendant] pulled the trigger." The first bullet went through Tompkins's jaw, ricocheted off his back tooth, and came to rest in his mouth. After the first shot, Tompkins began running and was subsequently shot four more times. The second shot grazed his neck, the third and fourth shots landed in his upper right arm, and the fifth shot hit him in the back. Tompkins continued to run while being shot and eventually ran into the nearby woods to hide. Tompkins testified that the pain "was probably the worst I've felt in my life" and that he was in shock and bleeding but able to walk. After waiting for the group to drive away, Tompkins walked to a nearby house where the resident called 911.

Regarding his injuries, Tompkins testified that he was required to wear a brace on his right arm for seven months and confirmed that he no longer had full use of his right arm. Tompkins was in the hospital for about two days, required physical therapy for his arm, and saw a specialist for the bullet wound to his jaw. Tompkins also testified that he was still in pain at trial and that he had permanent scarring on his face from the bullet wound. Tompkins explained that the experience was "continuous" to him and that he thought it probably occurred in a total "25, 30 seconds." Tompkins confirmed that he had "[n]o question whatsoever" that the Defendant was the one who shot him and identified the Defendant multiple times at trial. Tompkins also identified the Defendant, Martin, and Long from a photograph taken from Hardee's surveillance footage and verified a photograph of the Defendant's black TransAm that the group was riding in that night.

On cross-examination, Tompkins admitted that they were smoking marijuana in the silver car that first picked him up at Love's Truck Stop and that he had consumed about five ounces of the beer he had purchased. Tompkins testified that, although it was dark outside at the time of the shooting, the dome light in the car was on and he could clearly identify the Defendant.

Bethany Long testified that, on November 24, 2014, she was working at the Hardee's restaurant at Love's Truck Stop in Jackson, Tennessee. Long confirmed that Tompkins approached her while she was working and offered her $100 to drive him to Memphis. Long testified that she told Tompkins she did not have a car and that her boyfriend was picking her up after work. Long identified the Defendant at trial and confirmed that they had been dating for approximately five months at the time of the incident. The Defendant and Martin came to the Hardee's restaurant to visit Long while she was working, and then the Defendant returned later to take her home from work.

Long testified that, later that night, the Defendant picked her up at her grandmother's house with Tompkins and Martin in the car. Long testified that she drove the Defendant's car because she had a driver's license and the Defendant did not. After she began driving on the interstate towards Memphis, Long testified that the Defendant told her to drive to his mother's house instead. Long said that she refused and told the Defendant that he would have to drive, so she pulled over and they switched seats. Long also testified that she was feeling sick at the time and was pregnant. When the Defendant got to his mother's house, he kept driving and told Long that they were going to "take the back roads to Memphis."

Long testified that when the Defendant pulled over to check his headlight, it was not unusual, because the headlights on his car often stopped working. While the Defendant and Martin were at the front of the car, Long testified that she assisted by turning the lights on and off when suddenly "somebody told us to get out [of] the car." Long testified that she got out of the car and "the next thing I heard was, [g]et on the ground, and . . . the next thing I know, I heard a gunshot." After the shooting, Long got back in the car, "panicked" and "drove off" with the Defendant and Martin in the car. As they were driving away, Tompkins's phone began ringing, and Long said that Martin made her stop the car to get out and break the phone. Long testified that she began driving back to Jackson and that, after a while, Martin "started freaking out" and demanded to be let out of the car. As Martin exited the vehicle, Long said "it sounded like something hit the ground" and that she "assum[ed] it could possibly be the gun." Long stated that, after the shooting, the Defendant never appeared upset or said anything about what happened. On cross-examination, Long confirmed that Tompkins, the Defendant, and Martin all smoked marijuana in the car and that Tompkins was also drinking a beer.

James Martin testified that, on November 24, 2014, he was visiting his mother in Jackson while on Thanksgiving break from Virginia. Martin testified that he had known the Defendant for "about a year or two." He recalled that, on the night of the incident, the Defendant picked him up to hang out and ride around. Martin admitted that he was

smoking marijuana that night but testified that the Defendant did not smoke. Martin testified that, while he and the Defendant were eating at Hardee's waiting on the Defendant's girlfriend to get off work, Tompkins approached them and asked for a ride to Memphis. Martin confirmed that he, the Defendant, and a female friend of the Defendant's later picked up Tompkins at the Love's Truck Stop. He testified that they next went to the Defendant's car and picked up Long so she could drive to Memphis because the Defendant's license was suspended. Martin testified that after Long began driving on the interstate, she said she felt sick and pulled over so the Defendant could drive.

Martin recalled that the Defendant began driving into a rural area and then pulled over to check his headlights and told Martin to help him. Martin testified that when he and the Defendant were standing outside checking the headlights, the Defendant told him to "[g]o over there and get [Tompkins] out of the car" and he tried to hand Martin a gun. Martin testified that, when he refused to take the gun, the Defendant got angry and walked over to Tompkins, put the gun in his face, and told him, "[D]on't move or I'll shoot you." Martin testified that the Defendant then made him check Tompkins's pockets and that he took Tompkins's wallet and cell phone and put it in the back seat of the car. Martin testified that he did not want to search Tompkins but that "[the Defendant] had a gun. I didn't think I had a choice." Martin testified that he told the Defendant that Tompkins did not have anything else and to "let him go," but that the Defendant still forced Tompkins out of the car and onto the ground.

After he heard the gunshots, Martin testified that he ran away from the Defendant to the other side of the car because he was scared. The Defendant got back in the car, told Martin to get inside, and Long drove them away. Martin testified that, as they were driving away, the Defendant made Long turn the car around so he could "see if [Tompkins] was still out there," and that, after stopping to look for him, they drove away again. When Tompkins's phone began ringing, Martin testified that the Defendant made him take the phone, break it, and leave it on the side of the road. Martin testified that the Defendant had the gun in his lap while they were in the car after the shooting and that he later gave Martin the gun and told him, "[D]on't get caught with it." Martin said that he took the gun because "[he] felt like [he] had to" and he was "listen[ing] to everything [the Defendant] said." When he got out of the car, Martin put the gun "under a shed" nearby and then called his friend to pick him up. He recalled that Tompkins's wallet, tablet, and bag were left in the backseat of the Defendant's car.

On cross-examination, Martin admitted that he had smoked "probably, like, six, seven blunts" and that Tompkins had smoked "about three or four [blunts]" and was drinking a beer. Martin also acknowledged that he had never told officers where he hid the gun until his testimony at trial, that he attempted to flee when officers tried to arrest

him, and that he initially lied to officers about his involvement in the crimes. On re-direct, Martin clarified that, although he had smoked marijuana that night, he was not confused about who shot the gun and that the marijuana did not affect his memory in any way.

Sergeant Tom Knolton, an investigator with the Madison County Sheriff's Department Violent Crimes Unit and the lead investigator on the Defendant's case, testified that he first responded to the hospital to obtain a statement from Tompkins. Afterwards, Sergeant Knolton did a walkthrough of the crime scene and interviewed Long, who told the officers that Tompkins's phone had been thrown out on Betty Manley Road. Sergeant Knolton confirmed that officers had looked for the gun by tracing the route Long allegedly drove but that they had not located it. Sergeant Knolton testified that he obtained a search warrant for the Defendant's car and found a receipt dated November 24, 2014, for $20 of gas and two beers. After searching the car, the Defendant and his co-defendants were charged and arrested.

On cross-examination, Sergeant Knolton confirmed that Martin had never revealed the location of the gun until his testimony at trial. Sergeant Knolton also acknowledged that when officers first met Tompkins at the hospital in Jackson they were unable to obtain a written statement due to his injuries and that Tompkins's formal statement was taken later at a Memphis hospital with the assistance of officers from the Tennessee Bureau of Investigation.

At the conclusion of the above testimony, the State rested its case-in-chief and the Defendant moved for judgment of acquittal as to all counts. The trial court granted the Defendant's motion for judgment of acquittal as to the especially aggravated kidnapping charge, finding that there was insufficient evidence to allow the charge to go to the jury, but denied the motion as to all other counts. State v. White, 362 S.W.3d 559, 562 (Tenn. 2012) (requiring trial courts to determine whether a kidnapping charge is incidental to an accompanying felony or is significant enough, standing alone, to support a conviction).

The Defendant presented no proof and proceeded to argue in support of his pre-trial motion for an accomplice jury instruction. Defense counsel asked the trial court to give the instruction with regard to Martin, but not Long, and argued that Martin was an accomplice as a matter of law. The trial court agreed to give the accomplice instruction with respect to Martin, however, the trial court noted that "it will be a jury factual determination whether he was or was not an accomplice" because there was a factual dispute as to whether Martin voluntarily participated in the crimes. After deliberation, the jury returned a verdict of guilty as to all three remaining counts.

At the November 23, 2015 sentencing hearing, the trial court merged the aggravated assault conviction into the attempted first degree murder conviction and sentenced the Defendant to twenty-five years in the Tennessee Department of Correction to be served at 85 percent. The trial court also sentenced the Defendant to twenty-five years for the especially aggravated robbery conviction to be served at 100 percent and ordered both sentences to be served concurrently.

The Defendant filed a motion for new trial on December 8, 2015, and a hearing was held on January 4, 2016, at which the trial court denied relief. This timely appeal follows.

## ANALYSIS

On appeal, the Defendant argues that the evidence is insufficient to support his convictions for attempted first degree murder, aggravated assault, and especially aggravated robbery. He claims that the State failed to adequately prove his identity as to all three offenses, that the State failed to prove that Tompkins suffered serious bodily injury to support the attempted first degree murder conviction, and that the State failed to prove that Tompkins had a reasonable fear of imminent bodily harm to support the aggravated assault conviction. The Defendant also argues that his especially aggravated robbery conviction should be modified to an aggravated robbery conviction because any serious bodily injury Tompkins suffered occurred after the robbery was already completed. Finally, the Defendant argues that the trial court erred in submitting Martin's accomplice status as a factual determination to the jury, rather than declaring him an accomplice as a matter of law.

After carefully considering the evidence presented at trial, we agree with the State that the evidence was sufficient to sustain all three of the Defendant's convictions and that the trial court did not err in declining to instruct the jury that his co-defendant was an accomplice as a matter of law. However, we remand to the trial court for entry of a judgment form as to count two, as explained below.

**I.  Sufficiency of the Evidence.**  "Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)). When a defendant challenges the sufficiency of the evidence, the standard

of review applied by this court is "whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Parker, 350 S.W.3d 883, 903 (Tenn. 2011) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt."

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court shall not substitute its inferences for those drawn by the trier of fact. Id.

**A. Identity.** We begin our sufficiency of the evidence analysis by addressing the Defendant's argument that the State failed to prove his identity as the perpetrator as to all three of his convictions. In support of his argument, the Defendant appears to imply that Martin, not the Defendant, actually shot the victim, in part because Martin disposed of the gun and was "freaking out" in the car after the shooting. The Defendant points out that Martin did not report the incident to police, that he attempted to flee when officers arrived to arrest him, and that he initially denied any involvement in the crimes. The Defendant also argues that Martin and Tompkins are not reliable witnesses because of their admitted marijuana and alcohol use. The State responds that the evidence at trial established that the Defendant was the perpetrator and that the jury resolved any credibility issues with their verdict.

"The identity of the perpetrator is an essential element of any crime." Rice, 184 S.W.3d at 662 (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998). The identity of the defendant as the perpetrator may be established by direct evidence, circumstantial

evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing Strickland, 885 S.W.2d at 87). In addition, as relevant here, this Court has held that "the testimony of a victim, by itself, is sufficient to support a conviction." Strickland, 885 S.W.2d at 87 (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

Here, Tompkins positively identified the Defendant at trial as the individual who robbed and shot him. He testified that when the Defendant held the gun to his head, the Defendant was "to the right-hand side of [him]" so that he could view him clearly. Additionally, Tompkins testified that he was looking at the Defendant when he fired the first shot and made direct eye contact with the Defendant again as he shot him the second time. Tompkins also testified that, although it was dark outside at the time of the incident, the dome light in the car was on, allowing him to clearly see the Defendant. This testimony, alone, is sufficient to sustain the Defendant's conviction. See Strickland, 885 S.W.2d at 87. Although Tompkins admitted to smoking marijuana in the car before the shooting and initially lying to police, these facts do not undermine the jury's verdict, as the Defendant contends. The jury resolved any inconsistencies or credibility issues with their verdict, and we will not re-weigh or re-evaluate the evidence on appeal. Accordingly, we find that the evidence is sufficient to establish the Defendant's identity as to all three of his convictions in this case.

**B.** **Attempted First Degree Murder.** The Defendant next challenges his conviction for attempted first degree murder resulting in serious bodily injury. Specifically, the Defendant claims that the State has failed to prove that Tompkins suffered serious bodily injury.

As relevant here, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" T.C.A. § 39-12-101(a)(2). First degree murder is the premeditated and intentional killing of another person. Id. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment." Id. § 39-13-202(d). This section further defines premeditation:

 "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the

- 9 -

mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Young, 196 S.W.3d 85, 108 (Tenn. 2006) (citing State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997)); State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000). Factors that may support the existence of premeditation include, but are not limited to: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, the infliction of multiple wounds, declarations by the defendant of an intent to kill, lack of provocation by the victim, failure to aid or assist the victim, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, calmness immediately after the killing, and destruction and secretion of evidence of the killing. State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009); State v. Leach, 148 S.W.3d 42, 53-54 (Tenn. 2004); State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003); Bland, 958 S.W.2d at 660. In addition, a jury may infer premeditation from any planning activity by the defendant before the killing, from evidence concerning the defendant's motive, and from proof regarding the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

First, we note that serious bodily injury is not an element of attempted first degree murder. However, if a defendant is found guilty of attempted first degree murder "where the victim suffers serious bodily injury as defined in § 39-11-106," the defendant is not eligible for release until he serves 85 percent of his sentence. T.C.A. § 40-35-501(k)(5).

Serious bodily injury is defined as bodily injury that involves (A) a substantial risk of death; (B) protracted unconsciousness; (C) extreme physical pain; (D) protracted or obvious disfigurement; (E) protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) a broken bone of a child who is twelve years of age or less. T.C.A. §§ 39-11-106(a)(34)(A)-(F). This Court has held that the subjective nature of pain is a fact to be determined by the trier of fact. State v. Eric A. Dedmon, No. M2005-00762-CCA-R3-CD, 2006 WL 448653, at *5 (Tenn. Crim. App. Feb. 23, 2006), no perm. app. filed. Furthermore, this Court has specifically held that a scar satisfies the requirement for "protracted or obvious disfigurement." State v. Deonte Matthews, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct. 31, 2012), no perm. app. filed (citing cases in which a scar was held to be a sufficient basis for finding serious bodily injury).

The State contends that Tompkins's serious bodily injury is supported by factors (C) that the victim suffered extreme physical pain, (D) that the victim has a protracted or obvious disfigurement, and (E) that the victim suffered substantial impairment of a function of a bodily member. T.C.A. §§ 39-11-106(a)(34)(C)-(E). The Defendant argues that the State failed to prove serious bodily injury because the State introduced no medical proof to corroborate Tompkins's claims, because Tompkins's hospital stay did not exceed two days, and because Tompkins did not require surgery for his injuries. The Defendant also argues that, although Tompkins was shot in the face, because "his brain or eye or any other vital organs" were not damaged, there was no "substantial risk of death, as required by statute."

As an initial matter, the Defendant cites no legal authority or citations to the record in support of these assertions. Nevertheless, although his brief is woefully inadequate, we have thoroughly reviewed the record and will address the merits of the claim. First, a substantial risk of death is not required to establish serious bodily injury pursuant to Tennessee Code Annotated section 39-11-106(a)(34), as the Defendant contends. Rather, it is one of many factors that can, standing alone, constitute serious bodily injury. See T.C.A. §§ 39-11-106(a)(34)(A).

Tompkins testified that he suffered five gunshot wounds and classified his pain as the worst he had felt in his life. Tompkins also testified that he was still in pain a year later, had permanent scarring from the gunshot wounds, and lost complete function of his right arm, despite physical therapy and treatment. Tompkins's credibility and the subjective nature of his pain were factual determinations for the jury, and we will not re-evaluate them on appeal. Taken in the light most favorable to the State, the evidence is sufficient for a rational juror to conclude that Tompkins suffered serious bodily injury. The Defendant is not entitled to relief.

**C.  Aggravated Assault.**  The Defendant next argues that the evidence is insufficient to support his conviction of aggravated assault because the State failed "to prove that any criminal conduct by [the Defendant] caused [Tompkins] to reasonably fear imminent bodily harm."

In order to sustain the Defendant's conviction for aggravated assault, the State was required to prove beyond a reasonable doubt that the Defendant intentionally or knowingly caused Tompkins to reasonably fear imminent bodily injury by the use or display of a deadly weapon. See T.C.A. §§ 39-13-101(a)(2), Id. 39-13-102(a)(1)(A)(iii). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Id. § 39-11-302(a). Regarding the definition of the term "knowingly," this Court has concluded that the offense of aggravated assault

contains both "nature of conduct" and "result of conduct" elements. See State v. Szumanski Stroud, No. W2006-01945-CCA-R3-CD, 2007 WL 3171158, at *5 (Tenn. Crim. App. Oct. 29, 2007), (stating that the victim's being placed in fear of imminent bodily injury is a "result of conduct" element while the defendant's using or displaying a deadly weapon is a "nature of conduct" element.), perm. app. denied (Tenn. May 5, 2008). A person acts "knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." T.C.A. § 39-11-302(b). However, "[a] person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Id. "Aggravated assault based on fear requires the victim to have a 'well-grounded apprehension of personal injury or violence.'" State v. Lonta Montrell Burress, Jr., No. E2013-01697-CCA-R3-CD, 2014 WL 6855226, at *8 (Tenn. Crim. App. Dec. 4, 2014), (quoting State v. Jones, 789 S.W.2d 545, 550-51 (Tenn. 1990)), no perm. app. filed.

Tompkins testified that he believed the Defendant was trying to kill him after he had already been robbed and the Defendant forced him at gunpoint to lie on the ground. After being shot point blank in the face, Tompkins began running, in fear for his life, while the Defendant continued to shoot at him. Viewed in the light most favorable to the State, the evidence is more than sufficient for a rational trier of fact to find beyond a reasonable doubt that the Defendant intentionally or knowingly caused Tompkins to reasonably fear imminent bodily injury by the display of a deadly weapon.

The Defendant also appears to argue that his aggravated assault conviction should be reversed because the facts constituting the assault overlap with the facts constituting his attempted first degree murder conviction. However, this also appears to be precisely why the trial court merged the two convictions. The trial court stated that "[a]lthough the jury found him guilty on aggravated assault, it's really part of the same offense of attempted first degree murder. That will merge in to [c]ount [one]." As this Court has held, when the jury convicts a defendant of more than one alternative count of the charged offense, the trial court should merge the guilty verdicts into a single conviction. See Cribbs, 967 S.W.2d at 788 (Tenn. 1998) (recognizing that "when only one person has been murdered, a jury verdict of guilty on more than one count of an indictment charging different means of committing first degree murder will support only one judgment of conviction for first degree murder"); see also State v. Cooper, 336 S.W.3d 522, 523-34 (Tenn. 2011) (affirming that, while a jury can return verdicts of guilty for two alternative counts without the requirement of election, the trial courts should merge the convictions into one judgment of conviction).

Nevertheless, while the Defendant's convictions for aggravated assault and attempted first degree murder were properly merged, we detect some errors in the entry

- 12 -

of the judgment forms in this case. The trial court noted in the special conditions box on the attempted first degree murder judgment form that the Defendant's aggravated assault conviction was merging with the attempted first degree murder conviction; however, the trial court did not enter a separate judgment form for the aggravated assault conviction, as required by the Tennessee Supreme Court. See State v. Marquize Berry, No. W2014-00785-SC-R11-CD, slip op. at 5 (Tenn. Nov. 16, 2015) (order summarily granting the application of the defendant under Rule 11 of the Tennessee Rules of Appellate Procedure and reversing a portion of the judgment of the Tennessee Court of Criminal Appeals) ("[W]hen two jury verdicts are merged into a single conviction, the trial court should complete a uniform judgment document for each count."). Therefore, we must remand the case to the trial court for entry of a separate judgment form showing the entry of merger as to the specified count.

C. **Especially Aggravated Robbery.** The Defendant next contends that his conviction for especially aggravated robbery should be modified to aggravated robbery because the robbery was completed before any serious bodily injury occurred.

Robbery is the intentional or knowing theft of property from the person of another by violence or fear. T.C.A. § 39-13-401(a). Especially aggravated robbery is robbery, as defined in Tennessee Code Annotated section 39-13-401, which is accomplished with a deadly weapon and where the victim suffers serious bodily injury. See T.C.A. § 39-13-403. This Court has held that the serious bodily injury suffered by the victim "can precede, be contemporaneous with, or occur subsequent to but in connection with the taking of property of another." State v. Antonio Henderson and Marvin Dickerson, No. W2015-00151-CCA-R3-CD, 2016 WL 3390627, at *7 (Tenn. Crim. App. June 10, 2016), (citing State v. Antonio Jamarc Warfield, No. M2011-01235-CCA-R3-CD, 2012 WL 4841546, at *12 (Tenn. Crim. App. Oct. 5, 2012), no perm. app. filed), perm. app. granted (Tenn. Oct. 24, 2016).

The Defendant's entire argument in support of this issue states that "[t]he [a]ggravated [r]obbery offense was completed when property was removed from Mr. Tompkins's[ ] pockets. The [a]ttempted [f]irst [d]egree [m]urder was initiated when [the Defendant] allegedly told Mr. Tompkins to lie on the ground before shooting him in the fac[e]." We interpret the Defendant's argument to mean that his conviction must be modified because the robbery was completed before any serious bodily injury occurred. However, the Defendant again cites no legal authority in support of this proposition and his argument is directly contrary to this Court's holding, as stated above, that serious bodily injury can occur subsequent to but in connection with a robbery. We have already established that Tompkins suffered serious bodily injury, and Tompkins testified that the shooting began "25 or 30 seconds" after he was robbed and told to lie on the ground. Therefore, based on the evidence presented, a reasonable juror could conclude that

Tompkins's serious bodily injury occurred directly subsequent to, if not contemporaneous with, the robbery. The Defendant's argument must fail.

**II.  Accomplice Instruction.**  Finally, the Defendant argues that the trial court erred by failing to rule that his co-defendant, James Martin, was an accomplice as a matter of law. The State responds that the trial court correctly determined that Martin's accomplice status was a factual determination for the jury.

In Tennessee, it is well established that a conviction may not be based solely upon the uncorroborated testimony of an accomplice. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001) (citing State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964)). An accomplice is a person who "knowingly, voluntarily, and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." State v. Griffis, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997) (footnote omitted). To qualify as an accomplice, it is not enough that the witness possess guilty knowledge, be morally delinquent, or even have participated in a separate but related offense. See State v. Lawson, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The test is whether the alleged accomplice could be indicted for the same offense with which the defendant is charged. State v. Green, 915 S.W.2d 827, 831 (Tenn. Crim. App. 1995); Pennington v. State, 478 S.W.2d 892, 897-98 (Tenn. Crim. App. 1971). This Court has previously considered the issue of whether the court or the jury determines a witness's status as an accomplice:

> The question of who determines whether a witness is an accomplice depends upon the evidence introduced during the course of a trial. When the undisputed evidence clearly establishes the witness is an accomplice as a matter of law, the trial court, not the jury, must decide the issue. On the other hand, if the evidence adduced at trial is unclear, conflicts, or is subject to different inferences, the jury, as the trier of fact, is to decide if the witness was an accomplice. If the jury finds the witness was an accomplice, the jury must decide whether the evidence adduced was sufficient to corroborate the witness's testimony.

Griffis, 964 S.W.2d at 588 (footnotes omitted). In other words, if the evidence is clear and undisputed that a witness participated in the crime, then the trial court must declare the witness to be an accomplice as a matter of law and must instruct the jury that this witness's testimony must be corroborated; however, if the evidence is unclear, then the issue of whether a witness is an accomplice is a question of fact for the jury to decide, and if the jury decides that the witness is an accomplice, then it must determine whether there is sufficient evidence corroborating the witness's testimony. Id.; see Lawson, 794 S.W.2d at 369; see also Bethany v. State, 565 S.W.2d 900, 903 (Tenn. Crim. App. 1978).

- 14 -

"Where the facts as to complicity of the witness are disputed and susceptible to different inferences the issue is one of fact for the jury." See Green, 915 S.W.2d at 832 (citing Conner v. State, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975)).

As an initial matter, we note that the jury instructions are not provided in the record on appeal. Likewise, the trial transcript provided on appeal omits the trial court's instructions to the jury. The record does reflect, however, that the Defendant made a written motion requesting a jury instruction on accomplice as a matter of law, which the court orally denied at trial. The trial court reasoned that there was a factual dispute as to Martin's accomplice status because Martin testified that he was not a voluntary or willing participant in the crime and was instead ordered to participate by the Defendant.

Martin was named as a co-defendant in the same indictment as the Defendant and was charged, like the Defendant, with attempted first degree murder, aggravated assault, especially aggravated kidnapping, and especially aggravated robbery. However, the record is clear that Martin disputed his status as the Defendant's willing accomplice. Martin and Tompkins testified that the Defendant ordered Martin to search Tompkins and Martin testified that, when the Defendant tried to hand him a gun, he refused. Martin further testified that he "didn't think [he] had a choice" in helping the Defendant rob Tompkins because "[the Defendant] had a gun" and that he told the Defendant to "let [Tompkins] go." Martin stated that he was "nervous" and "scared" and that he was following the Defendant's instructions because he "felt like [he] had to." Martin also testified that he did not realize the Defendant's criminal intentions until he tried to hand him the gun and that they had not discussed any criminal plan beforehand.

The Defendant argues that, although Martin claimed he only participated in the crimes due to fear and at the Defendant's directions, "this claim is belied by Mr. Tompkins's testimony, which reflects a lack of hesitation on Mr. Martin's part." The Defendant again provides no citations to the record in support of this assertion, and we likewise fail to understand how a "lack of hesitation" to comply with the Defendant's commands somehow proves Martin was an accomplice as a matter of law. Regardless, the Defendant is effectively asking this Court to again discredit the jury's determination of credibility as to the witnesses at trial and, as stated previously, we will not re-analyze the jury's credibility decisions on appeal. Upon a thorough review of the record, we conclude that the trial court properly submitted Martin's disputed accomplice status as a factual question to be determined by the jury. The Defendant is not entitled to relief.

## CONCLUSION

We affirm the judgment of the trial court but remand the case for entry of a corrected judgment as specified in this opinion.

_____
CAMILLE R. McMULLEN, JUDGE